## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

ANTHONY SHAFFER <u>et al.</u>          *
                                      *
              Plaintiffs,             *
                                      *
        v.                            *          Civil Action No. 06-271 (GK)
                                      *
DEFENSE INTELLIGENCE AGENCY           *
<u>et al.</u>                         *
                                      *
              Defendants.             *
*     *     *     *     *     *     *     *     *     *     *     *

## PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO DISMISS

The plaintiffs, Anthony Shaffer ("Shaffer"), and J.D. Smith ("Smith"), filed this action to permit their attorneys to be provided at least verbal access to allegedly classified information necessary for protecting their legal interests. The defendants Defense Intelligence Agency ("DIA"), Department of Defense ("DoD"), Department of Army ("Army"), George Peirce, Robert Berry, William J. Haynes, III, and Tom Taylor, have refused to permit the plaintiffs to share any such information thereby interfering with their First Amendment right to counsel.[1]

Contrary to the defendants' claims, this case is not solely about the need for Shaffer to share allegedly classified information with counsel for the purposes of participating in Congressional briefings and/or hearings.[2] It is about the need for effective and appropriate legal representation and the scope of what that entails, which is best determined by this Court, not the defendants.

---

[1] Peirce and Berry, who are the General Counsel and Principal Deputy General Counsel of DIA, respectively, have been sued in both their individual and professional capacities. Haynes and Taylor, who respectively serve as the DoD General Counsel and Army Senior Deputy General Counsel, have only been sued in their professional capacities.

[2] Smith consents to the voluntary dismissal of his claims pursuant to Rule 41 of the Federal Rules of Civil Procedure.

## FACTUAL BACKGROUND

### A.  *ABLE DANGER*

At all times relevant to this case Shaffer served as a civilian employee of the DIA and DoD, and a reserve military officer for the Army. He performed certain duties in association with a DoD program code named ABLE DANGER, which included both classified and unclassified components. First Amended Complaint at ¶12 (filed February 27, 2006)("FAC"). ABLE DANGER was a United States Special Operations Command ("SOCOM") military intelligence program that was created as a result of a directive from the Joint Chiefs' of Staff in early October 1999 by the chairman of the Joint Chiefs of Staff, Hugh Shelton. It was designed to develop an Information Operations Campaign Plan against transnational terrorism, specifically al-Qaeda. Id. at ¶13.

Upon information and belief, ABLE DANGER identified the September 11, 2001 attack leader Mohamed Atta, and three of the 9/11 plot's 19 hijackers, as possible members of an al Qaeda cell linked to the 1993 World Trade Center Attacks or its participants. This information was contained, among other locations, on a chart prepared by Smith and turned over to Shaffer for use by ABLE DANGER. Although no specific criminal or terrorist activity was detected, these individuals were viewed as having associational links with known terrorists. Id. at ¶14.

ABLE DANGER used all information legally collected under the rule of law. All publicly obtained information was approved after a legal review of SOCOM lawyers. However, the information was ordered destroyed and this was accomplished by the Spring of 2001, after ABLE DANGER had been officially and formally shut down for unknown reasons. Additionally, upon information and belief, in or around Spring 2004, the DIA improperly destroyed ABLE DANGER and other files that Shaffer had maintained in his DIA work space. Id. at ¶15. If the primary assertion of the ABLE DANGER members is true, the early identification of Atta contradicts the official

conclusion of the 9/11 Commission that American intelligence agencies had not identified Atta as a potential terrorist prior to the 9/11 attack. Id. at ¶16.

Thus it was no surprise that former members of the 9/11 Commission, most notably former Senator Slade Gorton, who has appeared on numerous television programs on this matter, have publicly challenged these assertions and, at times, implicitly or explicitly called those who have claimed to the identification of Atta pre-9/11 as liars. Two other 9/11 Commission members, Timothy J. Roemer and John F. Lehman, both have claimed not to have received any information on Able Danger. Lee H. Hamilton, former Vice Chair of the 9/11 Commission, and Al Felzenberg, a former spokesman for the 9/11 Commission, both denied that the 9/11 Commission had any information on the identification of Mohammed Atta prior to the attacks. Id. at ¶17.

However, Shaffer asserts that in October 2003, in Bagram, Afghanistan, he told Philip D. Zelikow, the Executive Director of the 9/11 Commission, and three other 9/11 Commission staff members, that ABLE DANGER had identified 9/11 hijackers, "to include Atta". Although Zelikow told Shaffer that what he had said was "very important" and provided Shaffer his business card and asked him to call the Commission upon Shaffer's return to the United States, when Shaffer did so in January 2004, his attempts to establish recontact with the Commission were rebuffed. Instead Shaffer was told that the Commission had all the information it needed concerning ABLE DANGER from the Pentagon. Id. at ¶18.

In July 2004, Navy Captain Scott Phillpott independently met with 9/11 Commission staff and also informed them that ABLE DANGER had identified several 9/11 hijackers pre-9/11. Id. at ¶19. Not one mention of ABLE DANGER can be found in the 9/11 Commission's final report. Id. at ¶20.

On August 12, 2005, Thomas H. Kean and Lee H. Hamilton, former Chair and Vice Chair of the 9/11 Commission, issued a statement in response to media inquiries about the Commission's investigation of ABLE DANGER. They now stated the Commission

had been aware of the Able Danger program, and requested and obtained information about it from the DoD, but none of the information provided had indicated the program had identified Atta or other 9/11 hijackers. They also confirmed that Captain Phillpott had provided them information that Atta had been identified prior to the attacks but that it was just days before the Commission's report was scheduled to be released. Id. at 21. Now ABLE DANGER was described by a former 9/11 Commission senior staffer as "historically insignificant." Id. at ¶21.

### B. Allegations of Criminal and Other Inappropriate Conduct Led to the Revocation of Shaffer's Security Clearance

In or around April 2004, DIA informed Shaffer he was being placed on administrative leave and that his security was facing revocation. He was formally served in or around June 2004 with of a Notice to Revoke his security clearance. The allegations included offenses of a potential criminal nature. Indeed, in association with some of the allegations, Shaffer was appointed a military criminal defense attorney. Declaration of Mark S. Zaid, Esq., at ¶7 (dated May 12, 2006)("Zaid Decl."), attached at Exhibit "1".

Shaffer retained the undersigned counsel in or around April 2005 to substantively respond to the DIA allegations. As was customary at the time, Shaffer's counsel was provided access to classified information. In or around late April 2005, Shaffer submitted a sworn declaration attesting to the facts as he knew them to be. In order to provide this Court with a sense of the allegations, a copy of this document is attached at Exhibit "2". Shaffer and the undersigned met with DIA for a personal appearance in June 2005. Additional documents supporting the reinstatement of Shaffer's clearance were also submitted. ABLE DANGER played a substantive, though small at the time, role in these initial clearance proceedings. Up to this point Shaffer had not yet gone public with his knowledge of ABLE DANGER. Zaid Decl. at ¶8.

Everything changed when the news of ABLE DANGER became publicly known in August 2005. The defendants' retaliation and vendetta increased in intensity. Just days

before Shaffer was to testify before the Senate Judiciary Committee the following month, DIA revoked his clearance. Upon information and belief, this was a deliberate action undertaken by the defendants to attempt to further discredit Shaffer's credibility and directly tied to ABLE DANGER. An appeal was filed and in lightening speed, far quicker than the undersigned had seen in any prior DIA case in a decade, Shaffer's appeal was summarily denied. Had Shaffer's counsel had access to the alleged classified information regarding Shaffer's role in ABLE DANGER, it seems clear that a far more substantive appeal could have been submitted to DIA for consideration. Id. at ¶9.

Additionally, for the first time the undersigned has ever witnessed, DIA moved to suspend Shaffer without pay pending termination, the proposed action for which was to be initiated shortly. Fortunately, congressional intervention persuaded DoD to halt all DIA personnel actions against Shaffer until the conclusion of a still pending DoD Office of Inspector General ("DoD OIG") Investigation. Id. at ¶10.

It is Shaffer's belief that the defendants violated various statutes and regulations, as well as violated his constitutional rights, due to its actions against him as a result of ABLE DANGER. Notwithstanding the forthcoming conclusions by the DoD OIG, whatever they might be, Shaffer will pursue legal remedies to prevent DIA from terminating his employment, and will challenge the revocation of his security clearance. In order to do so, Shaffer's counsel obviously requires knowledge of the allegedly classified role Shaffer played with ABLE DANGER or otherwise it is not possible to effectively advise Shaffer on his legal rights or chances for success. While the question as to whether Shaffer is entitled to share classified information with his counsel is not yet before this Court, it seems clear that he is presently facing factual circumstances that justify such sharing.

### C. Request by Shaffer's Counsel to be Granted
### Authorized Access to Classified Information

By letter dated August 30, 2005, Shaffer's counsel requested that the defendants officially permit their access to relevant classified information concerning ABLE DANGER in order to represent Shaffer and others. This request was not conditioned on the utilization of the information for participation in Congressional inquiries. It was a general request in order to allow proper and effective evaluation of the legal and factual circumstances of Shaffer's case. However, it particularly cited, as an area of justification, the need to handle classified congressional and DoD inquiries. Exhibit "3". This request was then specifically supplemented the next day due to the issuance of a formal invitation for Shaffer to testify before the United States Senate. Exhibit "4".

By letter dated September 16, 2005, defendant Peirce responded on behalf of all defendants denying the undersigned counsel's request for access to classified information. Exhibit "5". Upon information and belief, defendant Berry participated in drafting and formulating the defendants' response. FAC, at ¶24.

In September 2005, both Shaffer and Smith were scheduled to testify before the United States Senate Judiciary Committee to discuss their involvement with ABLE DANGER. Shaffer submitted proposed testimony to the DoD for classification review, but the DoD has never responded. In any event, the defendants claimed all information concerning ABLE DANGER was classified and refused to consent to allow the testimony. Their undersigned counsel, Mark S. Zaid, testified in their place on September 21, 2005. Id. at ¶25.

By letter dated February 2, 2006, Shaffer renewed his request to share relevant classified information with his counsel, particularly in order to appear in a closed, classified House of Representative's hearing. Id. at ¶27; Exhibit "6". By letter dated February 14, 2006, defendant Peirce responded on behalf of all defendants denying the undersigned counsel's request for access to classified information. Exhibit "7". Upon

information and belief, defendant Berry participated in drafting and formulating the defendants' response. Peirce, as DIA General Counsel, does not possess the authorization or qualifications to render clearance determinations under the circumstances. Id. at ¶28.

On February 15, 2006, Shaffer and Smith testified before two Subcommittees of the House Armed Services regarding ABLE DANGER and related programs. Shaffer made his desire to be represented by counsel in the closed session, which was to include classified testimony. He publicly commented during his open session testimony (and reiterated during the closed session) that he was not going to be permitted counsel in the closed session and that this fact placed him in potential legal jeopardy. He noted that the defendants refused to permit undersigned counsel access to classified information so as to permit them to attend the closed, classified portion of the hearing and have therefore deprived Shaffer of his right to assistance of counsel during said hearings. Although the Subcommittees did not issue subpoenas, it was made clear that were Shaffer or Smith to decline to appear voluntarily they would be compelled to do so. Id. at ¶29.

Shaffer's credibility has been called into question and, based on the official views of the defendants and other current or former Government representatives, the claims he continues to make are nothing less than intentionally false. Therefore, Shaffer could potentially face prosecution should his answers to government investigators, or even public statements, be held to be either false or inconsistent thereby justifying and requiring effective and complete representation throughout every aspect of these matters. Id. at ¶33.

## ARGUMENT

The defendants initially seek to dismiss this case, not on substantive grounds, but on alleged procedural defects regarding subject matter jurisdiction under Rule 12(b)(1) and service of process under Rule 12(b)(5) of the Federal Rules of Civil Procedure. Both efforts should fail.

Federal courts are, of course, courts of limited jurisdiction and the law presumes that "a cause lies outside this limited jurisdiction." Kokkonen v. Guardian Life Ins. Co. of Am., 511 U.S. 375, 377 (1994); St. Paul Mercury Indem. Co. v. Red Cab Co., 303 U.S. 283, 288-89 (1938); see also Gen. Motors Corp. v. Envtl. Prot. Agency, 363 F.3d 442, 448 (D.C.Cir. 2004)(noting that "[a]s a court of limited jurisdiction, we begin, and end, with an examination of our jurisdiction"). Because "subject-matter jurisdiction is an 'Art. III as well as a statutory requirement[,] no action of the parties can confer subject-matter jurisdiction upon a federal court.'" Akinseye v. Dist. of Columbia, 339 F.3d 970, 971 (D.C. Cir. 2003), quoting Ins. Corp. of Ir., Ltd. v. Compagnie des Bauxites de Guinee, 456 U.S. 694, 702 (1982).

On a motion to dismiss for lack of subject-matter jurisdiction pursuant to Rule 12(b)(1), the plaintiff bears the burden of establishing that the court has subject-matter jurisdiction. Lujan v. Defenders of Wildlife, 504 U.S. 555, 561 (1992). The court may dismiss a complaint for lack of subject-matter jurisdiction only if "'it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief.'" Empagran S.A. v. F. Hoffman-Laroche, Ltd., 315 F.3d 338, 343 (D.C. Cir. 2003), quoting Conley v. Gibson, 355 U.S. 41, 45-46 (1957).

Because subject-matter jurisdiction focuses on the court's power to hear the claim, however, the court must give the plaintiffs' factual allegations closer scrutiny when resolving a Rule 12(b)(1) motion than would be required for a Rule 12(b)(6) motion for failure to state a claim. Macharia v. United States, 334 F.3d 61, 64, 69 (D.C.Cir. 2003); Grand Lodge of Fraternal Order of Police v. Ashcroft, 185 F. Supp. 2d 9, 13 (D.D.C. 2001). Moreover, the court is not limited to the allegations contained in the complaint. Hohri v. United States, 782 F.2d 227, 241 (D.C.Cir. 1986), vacated on other grounds, 482 U.S. 64 (1987). Instead, to determine whether it has jurisdiction over the claim, the court may consider materials outside the pleadings. Herbert v. Nat'l Acad. of Scis., 974 F.2d 192, 197 (D.C.Cir. 1992).

I.  **THE PLAINTIFFS POSSESS STANDING TO PURSUE THIS CASE AND THEIR CLAIMS ARE RIPE FOR ADJUDICATION**

There is no disagreement regarding the nuances of well-settled law regarding ripeness and standing. The basic rationale behind the ripeness doctrine is "to prevent the courts, through avoidance of premature adjudication, from entangling themselves in abstract disagreements over administrative policies, and also to protect the agencies from judicial interference until an administrative decision has been formalized and its effects felt in a concrete way by the challenging parties." Abbott Labs. v. Gardner, 387 U.S. 136, 148-49 (1967), overruled on other grounds, Califano v. Sanders, 430 U.S. 99 (1977).

A court may find challenges ripe for review after evaluating "(1) the fitness of the issues for judicial decision and (2) the hardship to the parties of withholding court consideration." Nat'l Park Hospitality Ass'n v. Dep't of the Interior, 538 U.S. 803 (2003), citing Abbott Labs., 387 U.S. at 149. The D.C. Circuit has characterized the ripeness inquiry as a balancing test where the court "balances the petitioner's interest in prompt consideration of allegedly unlawful agency action against the agency's interest in crystallizing its policy before that policy is subject to review and the court's interest in avoiding unnecessary adjudication and in deciding issues in a concrete setting." AT&T Corp. v. FCC, 349 F.3d 692, 699 (D.C. Cir. 2003), quoting City of Houston v. Dep't of Housing & Urban Dev., 24 F.3d 1421, 1430 (D.C. Cir. 1994)(internal quotation marks omitted).

Under AT&T's guidance, the fitness for review prong consists of two considerations: (1) "whether the disputed claims [are] presumptively suitable for judicial review;" and (2) "whether the court or the agency would benefit from postponing review until the policy in question has sufficiently crystallized by taking a more definite form." 349 F.3d at 699-700 (internal quotation marks and citations omitted). "Among other things, the fitness of an issue for judicial decision depends on whether it is 'purely legal, whether consideration of the issue would benefit from a more concrete setting, and whether the

agency's action is sufficiently final.'" <u>Atl. States Legal Found., Inc. v. EPA</u>, 325 F.3d
281, 284 (D.C. Cir. 2003), <u>quoting</u> <u>Clean Air Implementation Project v. EPA</u>, 150 F.3d
1200, 1204 (D.C. Cir. 1998). If a claim "rests upon contingent future events that may not
occur as anticipated, or indeed may not occur at all," it is not ripe for adjudication. <u>Id</u>. In
this Circuit, "the 'hardship' prong of the <u>Abbott Laboratories</u> test is not an independent
requirement divorced from the consideration of the institutional interests of the court and
agency. Thus, where there are no institutional interests favoring postponement of review,
a petitioner need not satisfy the hardship prong." <u>AT&T Corp.</u>, 349 F.3d at 700 (citation
omitted).

From a standing perspective, the analysis is quite similar. To satisfy standing
requirements, a plaintiff must demonstrate "that he 'has sustained or is immediately in
danger of sustaining some direct injury'" that is both "real and immediate" and not
"conjectural" or "hypothetical." <u>City of Los Angeles v. Lyons</u>, 461 U.S. 95, 101-02
(1983); <u>see also</u> <u>Northeastern Fla. Chapter. Associated Gen. Contractors of Am. v. City
of Jacksonville</u>, 508 U.S. 656, 663 (1993)(to establish standing, plaintiff must establish
an "injury in fact" that is "concrete and particularized" and "actual or imminent, not
conjectural or hypothetical"). It is plaintiffs who bear the burden of establishing that they
have standing to sue. <u>See</u> <u>Lujan,</u> 504 U.S. at 561.

**A.  Shaffer Has Standing To Challenge The Defendants' Actions And His Claims
    Are Ripe For Adjudication Given The Interference With His Attorney-Client
    Relationship, The Scope Of Which Cannot Be Limited By The Defendants**

The defendants assert that an "individual has no cognizable fight under the First
Amendment to have his private counsel be given access to classified information for
purposes of representing him when he appears as a fact witness at non-adversarial
congressional hearings and defendants' denial of plaintiffs' request for attorney access
was consistent with DoD regulations." Memorandum in Support of Defendants' Motion
to Dismiss at 2 (filed April 7, 2006)("Defs' Memo"). While the defendants' articulation

10

of congressional interest and importance is misplaced and contributes to the reasoning as to why this Court should deny their Motion, more importantly their restrictive depiction of the Shaffer's need for access is entirely inaccurate. This alone must defeat their Motion, particularly because this is a substantive argument regarding the merits of this case, and is not determinative of standing or ripeness.

Shaffer has not isolated his argument to the premise that the sharing of classified information with his counsel relies solely upon the interests of Congress and the possibility of future hearings or meetings. That was, to be sure, the predicate for the filing of the initial Motion for Temporary Restraining Order/Preliminary Injunction (filed February 15, 2006) given that Shaffer was facing imminent participation in a classified session, without counsel present, before two Subcommittees of the House Armed Services Committee. The defendants believe that "[u]nless and until, Congress actually compels plaintiffs to testify about classified matters, this Court should avoid issuing an advisory opinion on matters that might never occur and should dismiss plaintiffs' claims for lack of standing." Def's Memo at 2 (emphasis original). However, Shaffer's request for authorization to share relevant information with his attorneys – and hence the need for this litigation – has a scope that is far broader that defendants imply.

It should also be clear that, with respect to the Administrative Procedure Act claims, there has been final agency action in this case. The defendants have twice affirmatively denied Shaffer's request to provide his counsel with access to classified information. Exhibits "5" and "7". Nor is there any administrative policy that has not "sufficiently crystallized" itself. Most of the claims in this case revolve around the Constitution and seek declaratory relief. The defendants have failed to articulate any decisions that lack finality or crystallization.

At issue is whether or not the defendants can infringe upon Shaffer's First Amendment constitutional right to share classified or potentially classified information with his cleared counsel in order to obtain effective legal representation that would

permit adequate guidance and analysis on his legal choices and/or claims in general. This representation, and the need for information, is not contingent on the occurrence of any future events. It exists now. The administrative requests Shaffer submitted through counsel to the agencies were never limited to Shaffer's congressional involvement, but merely cited to Congress as one tangible justification for why access was needed. FAC ¶¶23, 27. Indeed, the relief sought by Shaffer in this litigation makes it quite clear that he is seeking to strengthen, and protect from intrusion, the entire attorney-client relationship. FAC at 12 (relief requested in this litigation regarding sharing of allegedly classified information is not limited to congressional events).

### 1.    Congress Remains Very Involved With ABLE DANGER And Shaffer

The defendants have undertaken a poignant effort to downplay the anticipated prospective role of Congress and its relationship to Shaffer's need for counsel's access to classified information. As the defendants argue, Shaffer's "First Amendment and APA claims are based on the mere supposition that plaintiffs will suffer some type of injury by testifying under oath at Congressional hearings or by being interviewed by investigators of the DoD's Office of Inspector General ("OIG") without their counsel being privy to classified information regarding ABLE DANGER." Defs' Memo at 10. Furthermore, the defendants heavily rely on the argument that the "absence of any allegation that Congress will compel their 'classified,' as opposed to 'unclassified,' testimony underlines the speculative nature of plaintiffs' claims." Id. at 11.

The defendants provide no factual, but more importantly no legal, distinction as to why this argument matters. One would imagine there is little doubt that were an individual compelled to testify in any type of proceeding, particularly where their legal interests were touched upon in some manner, the right to effective counsel is quite heightened. However, the voluntary nature of a proceeding does not lead to the contrary conclusion that an individual therefore loses the need or right to obtain effective counsel.

In any event, the defendants' claims about congressional intent or future plans with respect to ABLE DANGER and Shaffer have no basis in fact and are actually little more than supposition on the part of its counsel. The defendants have provided no evidence from Congress that pertains to this case. To the contrary, Shaffer has direct evidence from a leading Member of Congress, Curt Weldon, whose Subcommittee has direct jurisdiction over the ABLE DANGER controversy.

Congressman Weldon has made it clear that Congress continues to be involved with ABLE DANGER in general and Shaffer in particular. Declaration of Congressman Curt Weldon at *infra* (dated May 12, 2006)("Weldon Decl."), attached at Exhibit "8". He also noted that while there are no hearings presently scheduled, because of the speed in which the scheduling process often operates, this Court might not have the time to render a substantive ruling if it agrees with the defendants' arguments.

> The controversy surrounding ABLE DANGER and the plaintiffs remain a priority for me and other Members of Congress. The House Armed Services Committee, and certainly the Subcommittee I chair, remains seized of the matter, and other Congressional Committees are very interested in the topic as well. I fully anticipate that additional hearings will be scheduled by one or more Congressional Committees on the topic of ABLE DANGER and would likely require Lt Col Shaffer, and possibly J.D. Smith, to serve as a witness. Moreover, without a doubt, there are Members of Congress, and their staffs, who serve in positions that have jurisdiction over ABLE DANGER issues and who wish to be briefed by Lt Col Shaffer in a classified environment. In fact, I am aware of current Members and/or their staff who presently desire such a briefing. Although it is true that no Congressional hearings are currently scheduled which involve ABLE DANGER, such scheduling can occur with very little notice. If that occurs this Court would likely not be in a position to timely act especially given the delicate issues of national security that do need to be considered. Therefore, adjudicating this issue now would seem entirely appropriate.

Id. at ¶4.

Therefore, the only evidence in the record of congressional interest favors this Court's denial of the defendants' Motion.

    **2.**    **The Legal Circumstances That Necessitate Shaffers' Attorneys' Access To Classified Information Extend Far Beyond Congressional Involvement**

Shaffer's legal dilemma has already manifested itself, and he continues to face legal peril at the hands of the defendants. He had his security clearance revoked and is facing termination from his employment with DIA for matters related to his work on ABLE DANGER. FAC ¶26. Because of ABLE DANGER, both the clearance revocation and prospective termination are currently the subject of a DoD OIG investigation, and all personnel actions against Shaffer have been stayed pending the conclusion of that investigation.[3] Shaffer's actions have categorized him as a Whistleblower and as such he may or may not have certain legal rights that accompany such status. He also holds potential claims against the U.S. Government under the Constitution and various regulations/statutes, the full extent of which cannot be ascertained without his counsel having access to the full panoply of relevant information, and that certainly includes that which may be considered classified. These are very real and immediate issues.

To argue that Shaffer's claims are not ripe, or that he does not possess standing to raise his claims, would eviscerate significant aspects of the very nature of the attorney-client relationship that would permit clients to ascertain the extent to which they have been harmed or possess legal rights and potential remedies. In Caplin & Drysdale v. United States, 491 U.S. 617 (1989), the petitioner, which was a law firm, contended that a statute infringed on criminal defendants' Sixth Amendment right to counsel of choice, and upset the "balance of power" between the Government and the accused in a manner contrary to the Due Process Clause of the Fifth Amendment. The Court ruled that

---

[3] While it is true that Shaffer's personal participation in the DoD OIG investigation, which has included participation by his attorney, has not involved a classified meeting, classified information is a prominent aspect of the investigation. Had Shaffer's counsel been permitted to participate in classified meetings in order to protect his legitimate legal interests, Shaffer could have gone into more detail on his involvement and knowledge of ABLE DANGER activities and DIA retaliation. For now, the DoD OIG merely possesses some classified information from Shaffer as a result of observing his closed session congressional testimony.

standing existed recognizing that the attorney-client relationship was "one of special consequence" and that the statute at issue may "materially impair the ability of" attorneys to exercise their clients' constitutional rights. Id. at 624. Clearly if standing existed for the third-party law firm to protect the attorney-client relationship from interference by the Government, standing certainly exists for the harmed individual, i.e., the client such as Shaffer, to purse a similar claim.

The notion that individuals are entitled to obtain proper legal assistance and that interference with that process is a constitutional violation would seem unquestionable. Determining the extent of that violation clearly confers standing and signifies ripeness. For example, in In re Primus, 436 U.S. 412 (1978), the Supreme Court also noted that:

> efficacy of litigation as a means of advancing the cause of civil liberties often depends on the ability to make legal assistance available to suitable litigants. "'Free trade in ideas' means free trade in the opportunity to persuade to action, not merely to describe facts." Thomas v. Collins, 323 U.S. 516, 537 (1945). The First and Fourteenth Amendments require a measure of protection for "advocating lawful means of vindicating legal rights," [NAACP v.] Button, 371 U.S. [415], 437 [1963], including "[advising] another that his legal rights have been infringed and [referring] him to a particular attorney or group of attorneys . . . for assistance," id., at 434.

Primus, 436 U.S. at 432.

A similar situation existed in United States v. Schmidt, 60 M.J. 1, 4-5 (C.A.A.F. 2004). Though obviously a criminal case which therefore involves different substantive considerations with respect to the merits of the dispute, the underlying premise regarding the important nature of the attorney-client relationship (and how it can relate to standing/ripeness) remain the same.

> The Government must also respect the important role of the attorney-client relationship in maintaining the fairness and integrity of the military justice system. Now that civilian defense counsel has been granted an appropriate security clearance, we are confident that the military judge can take appropriate action to protect the Government's interest in restricting disclosure of classified information in a manner that respects the right of an accused service member under the Sixth Amendment and Article 27,

UCMJ, 10 U.S.C. § 827 (2000), to the effective assistance of counsel in preparing a defense. See United States v. King, 53 M.J. 425 (C.A.A.F. 2000) (mem.).

Id. at 5.

What the defendants are trying to do is place the cart before the horse, or at the very least delay the horse. Whether or not Shaffer is entitled to share classified information with his counsel goes to the balancing equation this Court must ultimately apply later in this litigation, but it is not a question of standing or ripeness.

**3.    Should This Court Still Question Shaffer's Standing Or The Ripeness Of His Claims The Defendants Should First Respond To Certain Discovery Requests Before The Issuance Of A Ruling**

On March 21, 2006, the plaintiffs served the defendants with document production requests, interrogatory requests and requests for admissions after receiving permission from this Court to do so. On April 19, 2006, just days before their response deadline, the defendants filed Motions for a Stay of Discovery and Extension of Time in Which to Serve Discovery Responses (despite the fact that at the March 17, 2006, Rule 16 Conference the defendants informed the Court that they intended to file this very motion and participated in the discussion regarding discovery). One of the primary reasons for the defendants' Motions was that they believed the responses would be irrelevant to the standing/ripeness issues. That is, indeed, true for some of Shaffer's discovery requests (which deal more with the merits of the underlying substance of the litigation regarding whether a "need-to-know" exists or whether counsel is trustworthy), but clearly not all.

As has been stated, contrary to the defendants' contention, this dispute is not limited to congressional involvement. Shaffer has a viable claim to argue that he desires to share allegedly classified information with his counsel. He has made that as perfectly clear as can be. That by itself should confer standing upon him and demonstrate he has met the burden for ripeness.

Alternatively, if the above has not persuaded the Court of this fact, the defendants should first respond to some of the discovery requests that pertain to the relevant regulations, policies, statutes and laws governing access to classified information, particularly by counsel, and determinations of "need-to-know". "The Government may establish appropriate procedures to protect its interests in restricting access to classified information pursuant to statutes, rules, and regulations. See e.g., Dep't of Defense, Regulation 5200.1-R, Information Security Program (January 1997)." Schmidt, 60 M.J. at 4-5.

If the relevant internal regulations and policies grant Shaffer the right to reach "need-to-know" determinations on his own, which Shaffer believes they do, then that clearly would support his argument that he has standing and his claims are ripe. The only way to obtain complete access to this information is through discovery as much of it is unavailable through other means.[4] The parties can then proceed to the true merits of the litigation.

## B.  Shaffer Has A First Amendment Right To Counsel That Is Being Infringed Upon By The Defendants

Though the merits of the litigation is not yet directly before the Court, the nature of the substance is relevant in order to better understand the framework of the dispute including that of ripeness and standing. Therefore, a brief foray into the legal analysis of the constitutional right to counsel that is at issue may be helpful.

This Circuit has explicitly recognized an individual's First Amendment interest in communicating with an attorney. See Jacobs v. Schiffer, 204 F.3d 259 (D.C. Cir. 2000); Martin v. Lauer, 686 F.2d 24 (1982); see also Denius v. Dunlap, 209 F.3d 944, 954 (7th Cir. 2000)("The right to hire and consult an attorney is protected by the First Amendment's guarantee of freedom of speech, association and petition."); DeLoach v.

---

[4] The document production requests that Shaffer believes are relevant to this Motion are numbers 1, 2, 9, 11 and 12; that of his interrogatory requests are numbers 3-6, 12, 14, 19, 21-22; and those of the admission requests are numbers 1, 7, 8, 10-12, 19-21.

Bevers, 922 F.2d 618, 620 (10th Cir. 1990)("The right to retain and consult an attorney ... implicates not only the Sixth Amendment but also clearly established First Amendment rights of association and free speech."). Like this case, both Jacobs and Martin involved government restrictions on what information employees could share with their lawyers.

These Circuit holdings are buttressed by Supreme Court precedent recognizing a constitutional right of unfettered access to counsel. It has long been recognized by the Supreme Court that the First Amendment prohibits the government from interfering with collective action by individuals to seek legal advice and retain legal counsel. See United Transp. Union v. State Bar of Mich., 401 U.S. 576, 585-86 (1971)("Collective activity undertaken to obtain meaningful access to the courts is a fundamental right within the protection of the First Amendment."); United Mine Workers of Am. v. Illinois State Bar Ass'n, 389 U.S. 217, 221-22 (1967)("The freedom of speech, assembly, and petition guaranteed by the First and Fourteenth Amendments gives petitioner the right to hire attorneys on a salary basis to assist its members in the assertion of their legal rights."); see also Brotherhood of R.R. Trainmen v. Virginia, 377 U.S. 1, 6 (1964); Button, 371 U.S. at 429-30.

So too is an individual's ability to consult with counsel on legal matters constitutionally grounded. See Bates v. State Bar of Ariz., 433 U.S. 350, 376 n.32 (1977)("Underlying [the collective action cases] was the Court's concern that the aggrieved receive information regarding their legal rights and the means of effectuating them. This concern applies with at least as much force to aggrieved individuals as it does to groups."); see also Trainmen, 377 U.S. at 7 ("A State could not ... infringe in any way the right of individuals and the public to be fairly represented in lawsuits....").

Furthermore, the right to obtain legal advice applies equally to legal representation acquired for any purpose - including to advocate a political or social belief, Button 371 U.S. at 419-20, or to recover damages in a personal injury suit, United Mine Workers,

389 U.S. at 223. In sum, the First Amendment protects the right of an individual or group to consult with an attorney on any legal matter. Denius, 209 F.3d at 954.

The First Amendment interest in speaking freely to counsel is "interwoven" with the fundamental and constitutionally protected right of access to the courts. Martin, 686 F.2d at 32. Without the right of access to the courts, "all other legal rights would be illusory." Id. Meaningful access to the courts is contingent on the ability of an attorney to give sound legal advice, and "restrictions on speech between attorneys and their clients directly undermine the ability of attorneys to offer sound legal advice." Id.

While it is true that none of the cases cited above address the question of the appropriate balance between an individual's right to consult with counsel and the government's interest in protecting national security information, the strength of the interest asserted by the government to counterbalance the plaintiffs' First Amendment interests does not negate the implication of Shaffer's interests here. Shaffer's ability to receive sound advice from counsel as to the legality of the actions and statements taken against and regarding them has been infringed by defendants' denial of access to the plaintiffs' attorney.[5] See Stillman v. DoD, 209 F. Supp. 2d 185 (D.D.C. 2002), rev'd on other grounds, 319 F.3d 546 (D.C.Cir. 2003).

Shaffer is unable to speak freely with his attorneys about his knowledge of specific and relevant events that led to the actions undertaken and statements asserted by the Government and its officials. As the Supreme Court has recognized, "the first step in the resolution of any legal problem is ascertaining the factual background and sifting through the facts with an eye to the legally relevant." Upjohn Co. v. United States, 449 U.S. 383,

---

[5] The defendants frequent citation to Department of Navy v. Egan, 484 U.S. 518 (1988) notwithstanding. This case is continually misinterpreted in an expansive manner as to give the impression that Article III courts cannot adjudicate or challenge agency security clearance determinations. Egan's authority is strictly limited to an interpretation of the statutory jurisdiction of the Merit Systems Protection Board.

390-91 (1981). Indeed, the plaintiffs have a "legitimate interest in an early assessment of [their] legal rights." Id.

### III. THE DEFENDANTS HAVE EITHER BEEN SERVED OR ARE IN THE PROCESS OF BEING SERVED

This case was filed on February 14, 2006. No Complaint was filed as it initially began as a Motion for Temporary Restraining Order/Preliminary Injunction. The First Amended Complaint was filed on February 27, 2006. The Clerk of the Court issued Summonses on March 6, 2006. The Summons are valid for 120 days.

As an alternative defense the defendants argue that the case should be dismissed due to a lack of service. This defense requires short shrift.[6] The federal defendants have been properly served. The U.S. Attorney's Office received the Summons and Complaint on May 1, 2006. Zaid Decl. at ¶¶4-5; Exhibit "1A". Additionally, the individual defendants are in the process of being served through the U.S. Mail as permitted by Rule 4 of the Federal Rules of Civil Procedure. A copy of the First Amended Complaint and two copies of Form 1B (Waiver of Service of Summons), along with a SASE, was mailed to both individual defendants on May 12, 2006. Zaid Decl. at ¶6. Whether they have cognizable legal defenses to relieve them of personal liability is not an issue before this Court at this time.

---

[6] For one thing, the plaintiffs properly served the federal defendants pursuant to the appropriate rules governing the filing of a Motion for Temporary Restraining Order/Preliminary Injunction pursuant to LCvR 65.1. The defendants participated in proceedings relevant to that Motion.

## **CONCLUSION**

Based on the foregoing, the defendants' Motion to Dismiss should be denied.

Dated: May 12, 2006

Respectfully submitted,

/s/

_____

Mark S. Zaid, Esq.
DC Bar #440532
Krieger & Zaid, PLLC
1920 N St., N.W.
Suite 300
Washington, D.C. 20006
(202) 454-2809
ZaidMS@aol.com

Attorney for Plaintiffs