I, Anthony Allen Shaffer, hereby declare as follows:

1.  I am a person over eighteen (18) years of age and competent to testify.  I make this initial statement on personal knowledge and in support of my response to the 30 Jun 2004 Notice of Intent to Revoke Eligibility for Access to Sensitive Compartmented Information issued by the Defense Intelligence Agency (DIA).

2.  I have served with distinction in the service of the United States Government for the past 23 years.  My personnel evaluations or Officer Evaluation Report (OER) reveal an exemplary record of service – many are "top block" OERs. Additionally, my civilian appraisals have included cash awards on nearly a dozen evaluation periods over the past 17 years. As a reserve officer, even without a security clearance, I have been attached by Army Intelligence leadership to a Navy special program in which I have been assigned a major role in organizing and creating a specific counterterrorism capability that will support not only the Navy, but also DoD's Global War On Terrorism.

3.  I was awarded the Bronze Star Medal (BSM) for my work in support of combat operations in Afghanistan during my July-Dec 2003 deployment for Operation ENDURING FREEDOM. I served as the DHS representative to the most sensitive, highly classified operational unit conduct operations in the CENTCOM Area of Responsibility.  This Bronze Star award was provided outside of DIA's Joint Reserve Unit award processing mechanism and presented to me while still in Afghanistan. COL Jose Olivero, the nominating officer, is now assigned to the Pentagon and can be easily contacted to verify my work.

4. The U.S. Army reviewed the DIA IG report of 2 March 04 and fully cleared me of any wrongdoing. The DIA IG has known this fact since 30 Jun 04. I find it incredulous that this fact is neither referenced in the SOR nor seemingly been considered.

5. As to the DIA Statement of Reasons (SOR), paragraph 1, I was cleared by the Army. The Army affirmatively decided not to take any punitive or administrative action against me. The Army concluded, as is evidenced in the DIA IG report, that the conclusions reached by Mr. Mike Kingsley are not factually supported by the content of the report.

6. As to paragraph 1.a through 1.c allegations regarding questionable judgment, trustworthiness and personal conduct:

a. I stand by my sworn statements that are contained in the DIA IG report, and I incorporate those answers herein. From my perspective, my statements were neither contradicted nor impeached by the DIA IG investigator.

b. As to the "undue award" allegation in 1.a. I prepared and put the award into the system to be processed using the guidance given to me by my superiors. The award was processed through the DIA awards system. The DIA IG report confirmed this fact. The DIA IG report on this issue contains a great number of "opinions" of officers who were not in my chain of command who felt that they should have the right to "veto" the award. Their opinions are just that - opinion. I provided the DIA IG the name of officers who were aware of the activities in question and would support the issuance of the award. Yet no follow-up was done to interview these officers. The officers who had direct knowledge of my activities are: COL (ret) Gerry York, Mr. (GS-15) Al Downs, CDR Scott Phillpott and FBI Special Agent Xanthie Mangum.

c. As to the "false travel claim" in 1.b. I filed for mileage reimbursement for travel to and from a professional military development school (Command and General Staff Phase II, Ft. Dix, New Jersey). The mileage was claimed as an expense based on guidance I received from HRC St Louis (Mr. Jim Rutledge) to file for mileage reimbursement. The voucher was reviewed by multiple officers in the normal voucher processing system prior to being paid. The funds have never been "collected" back as they were due to me. Had they been denied or collected I could have made a legal tax deduction as this was a professional expense; there was no fraud committed against the U.S. Government. The amount of travel mileage and toll fees was less than $200.00. I never claimed reimbursement for $341.80.

d. As to the "misuse of a government owned cellular phone" in 1.c. The DIA IG evaluation of my phone's records showed that it was used within the policy guidelines of the unit to which the phones were assigned. There was no violation of any DoD regulation or guideline by the use of my phone. The only expense incurred beyond the normal planned minutes was incurred when I forwarded the government cellular phone to my personal phone. This was an expense that was incurred in the best interests of the government so that I could always be reached as a unit commander – even when off duty and on weekends. The forwarding of phone calls from the government phone to my personal phone was an expense that, as a commander, I could and did approve. There was no misuse of the phone and the $67.79 expended by the forwarding of calls from the government phone to my personal phone was a legitimate expense.

7. The DIA/DAC conclusions in paragraph 1.d (mislabeled "c") that I violated provisions of the UCMJ are simply wrong, and are second-guessing the appropriate

military officials/experts who had original and sole jurisdiction over these very matters.

The Military District of Washington (MDW) JAG did not file a UCMJ Statement of

Charges and did not administer any adverse punitive actions.  I received an honorable

discharge from active duty on 1 June 04, and the DMSM in question stood Army review

of the issue as it is listed as part of my awards for the period of active duty service.  There

are no adverse punitive or administrative issues pending in the Army legal system or in

my official 201 file. This can be confirmed by checking with Army Human Resource

Command (HRC) St Louis (Mr. Jim Rutledge).

    8.  As to paragraph 1.e. through 1.g. which refers to questionable judgment,

trustworthiness and personal conduct:

    a.  Of the four alleged "verbal counselings", only one occurred.  The three others

never occurred and the DIA documentation provided by DAC shows that I was not

counseled. Therefore, there is no basis for using these counselings against me.

    b.  As to the alleged "failure to properly safeguard classified information" verbal

counseling by the DHS Chief of Operations at 1.e, this "counseling" never occurred.

DAC's own documents prove this allegation to be false. Mr. William Halpin, who was

not even my supervisor (though the DAC report of 24 September 1998, File No. 20-0421

incorrectly lists him under "Supervisor Interview"), was interviewed on 9 Oct 97.  Mr.

Halpin was of the opinion that I should have been reprimanded but no such letter was

read or prepared to my knowledge.  COL Gerry York (ret) was then the DHS Chief of

Operations and he can confirm that he never read any letter of reprimand, and that he did

not verbally counsel me on any compromise as DAC never provided any evidence of a

compromise of classified information. Mr. Halpin had no direct knowledge of the alleged

incident.  In fact, there was never a failure to safeguard classified information.  The briefing in question was conducted in a SCIF at the TS/SCI level and there was no inadvertent disclosure – all officers present had TS/SCI level clearances.

    c.   As to the allegation that I "circumvent[ed] my supervisory chain of command to provide briefings to the Director of Intelligence Operations", at 1.f, this is untrue.  My performance appraisal for the period (1997-98), prepared and signed by LTC (now retired) Tom Grant, my then supervisor, shows that I was rated as "superior".  Had such "circumventions" occurred, one would have thought they would have impacted my rating. MG (ret) Bob Harding, the then Director of Intelligence Operations, was never interviewed by DAC regarding this issue.  I have discussed this with both him and COL (ret) York. Due to my oversight of several special access operations – some of which not even LTC Grant was aware of – I was obligated to provide them updates both during the week and on weekends.  LTC Grant was never fully aware of several JSOC and FBI support projects my unit was involved in supporting.

    d.   As to being "verbally counseled" by my supervisor regarding "misuse of U.S. government credentials as stated in paragraph 1.g., this allegation is false.  While LtCol Bob Brown, my then supervisor, did discuss the issue with me, as noted in the DAC agent report, I was never told that I should not have used the credential. The credentials were only presented after a DAC Special Agent who was with me, Mr. Anthony Cerullo, told me to use the credential to identify who we were at the traffic stop. Mr. Cerullo was then, and is to the best of my knowledge, still a special agent with DAC. He can verify the nature of the use of the credential and the fact that there was no misuse. There was no similarity between this and the "misuse of credentials" in the paragraph 1.i allegation.

Although it is true I was accused of being drunk in public, as stated in paragraph 1.i;

there was no alcohol involved or an arrest.

9.   As to paragraph 1.i, while AF Security Office (AF Clearance Facility) did

administratively and temporarily suspend my classified access in 1991, it is noteworthy

to point out that the Army Central Clearance Facility (CCF) did not.  I was on active duty

as a member of the active U.S. Army for DESERT STORM when Air Force leadership,

COL Pete Klein, the then Air Force Special Activities Center (AFSAC), the organization

I was assigned to as a civilian employee, chose to use the "drunk in public" issue that had

been resolved in 1990 as a method of retaliation in 1991.  My TS/SCI clearance was not

suspended, but instead was sustained by the Army while Defense Investigative Service

(now the Defense Security Service (DSS)) conducted an independent investigation.  DSS

Special Agent Ann Clark conducted the investigation. Her investigation cleared me of

any wrongdoing, and concluded that I did not make false statements to law enforcement

officials. The Army favorably adjudicated her report and my TS/SCI clearance was

completely cleared.

10. Nevertheless, I was formally cautioned by Army CCF that my use of alcohol was

of concern and I was warned to control my use of alcohol otherwise it could be a factor in

future clearance adjudications.  Taking the CCF caution to heart, I joined Alcoholics

Anonymous (AA) and have not taken a drink in almost 13 years.  One additional item of

note: AFSAC leadership provided me a top block Civilian Personnel Appraisal for the

period 1990-1991 with a performance bonus – this report is part of the official record and

DSS's investigative results.  This Civilian appraisal, in which I was given an

"outstanding" rating was signed by the same AFSAC O-6, Col Larry Kanda, on the same day he signed the document to suspend my security clearance.

11. As to paragraph 1.h. of the SOR, verbal counseling by my "superior" regarding the misuse and misappropriation of a DoD identification card, DIA/DAC never provided any background documentation to show how or where this happened; in fact this (the counseling and misuse or misappropriation) never did happen. I was never counseled by anyone at AFIA on any such issue. Upon my departure from AFIA for Army, in the August 1991 timeframe, Mr. Carl Allard did a review of the content of my classified information contained in my safe at AFIA. Within the safe was a new, unused, pink ID card that had been assigned to me for use in a clandestine operation that I was running in support of a DIA special project. The ID card was never completed and laminated because it was not needed for the operation. It remained in my custody, locked in a secure container, pending my need to use the document (which would have been used in the alias I was using for the operation had I needed it) - and that is where it was found - locked in a secure container. I followed proper procedures - having obtained the document from the Det 23 Document Custodian - and it remained in a classified container - it was never taken out or misused. The DSS investigation, conducted by Special Agent Ann Clark, specifically reviewed this issue the following year and confirmed and supported the facts that I've outlined above. Furthermore, within SA Clarks' investigation witnesses stated that they observed evidence of a pattern of abuse and manipulation by AFIA officers, to include Carl Allard, in attempting to cause permanent harm to my career through false accusations.

12. As to paragraph 1.j, allegations regarding questionable judgment, trustworthiness and personal conduct, DSS Special Agent Ann Clark conducted the SBI investigation that confirmed that these issues were youthful indiscretions (late 1970s and early 1980s). My "altering" of documentation was done so specifically upon the direction of my superior officers. These issues were all fully reviewed and adjudicated favorably by Army CCF based on Special Agent Clark's investigation.

13. As to paragraphs 2-4 of the DIA SOR, I adopt my responses above to adequately address the allegations.

14. Finally, with respect to the claim in paragraph 5 that available information tends to show financial irresponsibility, the statements are factually inaccurate.

a.  The American Express (AMEX) debt of $2,012 is fully paid and closed.  It went into arrears when I was in Afghanistan and deployed in Alias. Obviously, I could not handle my own bills due to this status and the person I left my power of attorney with, Ms. Norina MacNeill, unfortunately neglected to pay the AMEX during the periods of my deployments. Once it was brought to my attention, the debt was paid.

b.  As to the IC System collection for $96, that minor debt was incurred by my stepdaughter on her medical insurance. Once the medical provider, Virginia Pediatrics, was contacted the debt was removed.

c.  As to the government sanctioned Bank of America credit card, DAC investigated this matter and their report is accurate. When I was not reimbursed for my TDY airfare for travel to New Zealand (about $2,000.00) and other TDY's, I respectfully declined to pay off the card until I received my reimbursement from the U.S. Government.  The fact

that the reimbursements were delayed, due to no fault of my own, is verifiable through

the DoD financial accounting system.

I do solemnly affirm under the penalties of perjury and upon personal knowledge that

the contents of the foregoing paper are true to the best of my knowledge.

Date: 28 April 05


/s/
_____

Anthony Shaffer